<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| **DAVID PIEGARO**, <br><br> Plaintiff, <br><br> v. <br><br> **THE TRUSTEES OF PRINCETON UNIVERSITY**, *et al.*, <br><br> Defendants. | Civil Action No. 25-13919 (ZNQ) (JTQ) <br><br> **OPINION** |

<u>**QURAISHI, District Judge**</u>

**THIS MATTER** comes before the Court upon a Motion to Dismiss filed by Defendants The Trustees of Princeton University ("Trustees") and Kenneth E. Strother, Jr. ("Strother") (collectively, "Defendants"). ("Motion," ECF No. 17.) Defendants filed a brief in support of their Motion. ("Moving Br.," ECF No. 17-1.) Plaintiff David Piegaro ("Plaintiff") filed an opposition brief ("Opp'n Br.," ECF No. 20), to which Defendants replied ("Reply Br.," ECF No. 21).

The Court has carefully considered the parties' submissions and decides the Motion without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, the Court will **GRANT IN PART** and **DENY IN PART** the Motion.

I.      BACKGROUND AND PROCEDURAL HISTORY

A.      PROTESTS ON PRINCETON UNIVERSITY'S CAMPUS

A wave of protests at college campuses across the country began in April 2024 in response to the conflict in Gaza.  (Compl. ECF No. 1 ¶ 22.)  On April 25, 2024, individuals erected the "Gaza Solidarity Encampment" in Princeton University's (the "University") McCosh Courtyard. (*Id.* ¶ 26.)  By noon, approximately 250 individuals, including University students and faculty, were participating in the encampment.  (*Id.*)

On April 29, 2024, the Council of the Princeton University Committee hosted a regularly scheduled meeting in Frist Campus Center.  (*Id.* ¶ 27.)  Protestors aimed to disrupt the meeting. (*Id.*)  Additionally, a group of protestors headed toward Clio Hall, which borders McCosh Courtyard.  (*Id.* ¶ 28.)  The protestors occupied Clio Hall in attempts to force the University to negotiate with Princeton Israeli Apartheid Divest, a student group calling for the University to divest from Israel.  (*Id.*)  Officers from the University's Department of Public Safety ("DPS") warned that anyone remaining in Clio Hall after 5:30 p.m. would be arrested.  (*Id.* ¶ 29.)  At least thirteen protestors remained in Clio Hall.  (*Id.*)  Meanwhile, a crowd of approximately 200 protestors surrounded Clio Hall.  (*Id.*)

B.      THE ALTERCATION AT WHIG HALL

At 5:55 p.m., Plaintiff, a Jewish U.S. Army veteran undergraduate student at the University, learned of the Clio Hall occupation and went to observe and report as a neutral journalist.  (*Id.* ¶¶ 1, 30.)  At 6:00 p.m., DPS officers arrested and escorted two student protestors from Clio Hall.  (*Id.* ¶ 31.)  The two student protestors were moved to a bus parked outside Clio Hall.  (*Id.*)  Several protestors blocked Clio Hall's doors to prevent additional student protestors

2

from being moved to the bus.  (*Id.* ¶ 31.)  Other protestors surrounded the bus, banging on the bus windows.  (*Id.* ¶ 32.)

Plaintiff arrived at McCosh Courtyard at approximately 6:05 p.m.  (*Id.* ¶ 33.)  Plaintiff took videos and photos of the scene outside of Clio Hall.  (*Id.*)  Plaintiff then entered several nearby buildings to see if he could take additional photos and videos from different angles.  (*Id.* ¶ 34.) Eventually, Plaintiff entered Whig Hall but went back outside when he was unable to find a good vantage point for footage.  (*Id.*)  Around 6:52 p.m., DPS officers released the arrested students from custody, including those detained on the bus.  (*Id.* ¶ 35.)

Approximately an hour later, at around 7:45 p.m., Plaintiff witnessed a man in a suit speaking with a leader of the University's Faculty for Justice in Palestine ("FJP") group and another man.  (*Id.* ¶ 36.)  Unbeknownst to Plaintiff, this man was Strother, the Assistant Vice President for Public Safety and Chief of Police.  (*Id.* ¶ 16.)  Strother was not wearing a uniform, badge, DPS shirt, body-worn camera, or any other indicator that he was a police officer.  (*Id.* ¶ 37.)

Plaintiff approached the group outside of Whig Hall.  (*Id.*)  Strother told Plaintiff that the group was having a private discussion.  (*Id.*)  Plaintiff said that he had a right to be present in a public location and began video recording the group.  (*Id.* ¶¶ 36, 37.)  When the group reached the top of the stairs at the entrance of Whig Hall, Plaintiff asked Strother for his name and position. (*Id.* ¶ 37.)  Strother ignored Plaintiff and swiped his Princeton ID to enter Whig Hall.  (*Id.*)  Strother held the door open for the other two men in the group to proceed inside Whig Hall.  (*Id.* ¶ 38.) When Plaintiff attempted to walk through the door, Strother grabbed Plaintiff's arm and pulled Plaintiff back from the door.  (*Id.* ¶¶ 38, 39.)  Strother yelled that Plaintiff was under arrest.  (*Id.* ¶ 39.)  Strother then picked Plaintiff up with both hands and dropped Plaintiff down the Whig Hall

steps.  (*Id.* ¶ 40.)  A witness reported that Strother "was holding [Plaintiff] horizontally like an open pair of scissors" and dropped Plaintiff down the stairs.  (*Id.* ¶ 41.)  Strother then walked to where Plaintiff was lying at the bottom of the stairs, grabbed Plaintiff by the wrist, and restrained Plaintiff on the ground, where he was later handcuffed.  (*Id.* ¶ 42.)

Several DPS officers transported Plaintiff in a marked patrol vehicle.  (*Id.* ¶ 43.)  On the drive, Plaintiff complained of pain in his ribs.  (*Id.*)  Despite his complaints, Plaintiff was placed into a holding cell upon his arrival at DPS headquarters.  (*Id.*)  Some time later, Plaintiff was transported via ambulance to Princeton Medical Center.  (*Id.*)  X-rays and CT scans revealed that Plaintiff suffered rib injuries, a concussion, and several abrasions as a result of the altercation at Whig Hall.  (*Id.* ¶ 44.)

After he was released from the hospital, Plaintiff returned to DPS headquarters where he was photographed and fingerprinted.  (*Id.* ¶ 45.)  At 12:21 a.m. on April 30, Plaintiff was released from DPS custody.  (*Id.* ¶ 46.)

Later the same day, Plaintiff went to University Health Services to get further treatment for his injuries.  (*Id.* ¶ 50.)  While at University Health Services, a DPS officer was dispatched to University Health Services and informed Plaintiff that he was banned from campus, including from his on-campus apartment.  (*Id.* ¶¶ 51, 54.)  Plaintiff did not receive formal communication from the University about his ban until the following day.  (*Id.* ¶ 55.)  The formal communication also informed Plaintiff that the University had begun to investigate his alleged misconduct and was considering disciplinary charges.  (*Id.*)

### C.    STROTHER'S TESTIMONY & THE CHARGES AGAINST PLAINTIFF

On May 1 and 2, 2024, Strother filed written reports of the incident outside Whig Hall.  (*Id.* ¶ 63.)  Plaintiff alleges that these reports are filled with false statements intended to protect Strother

and to ensure charges against Plaintiff survived. (*Id.*) For example, Strother erroneous claimed in these reports that Whig Hall was locked. (*Id.* ¶ 64.) Strother maintained that Whig Hall was locked during the University's investigation as well as during Plaintiff's criminal trial. (*Id.* ¶ 65.) Additionally, Strother erroneously alleged: (1) that he put his arm out to block Plaintiff from entering Whig Hall and that Plaintiff was the first to make physical contact (contradicted by video evidence) (*id.* ¶ 66), (2) that he told Plaintiff that Whig Hall was closed (contradicted by video evidence) (*id.* ¶ 67); (3) that Plaintiff's efforts to pull away caused Strother to lose his grip on Plaintiff, resulting in Plaintiff's fall down the stairs (contradicted by eyewitness testimony) (*id.* ¶¶ 68, 69); (4) that immediately after Plaintiff's arrest Strother told DPS officers that Plaintiff was banned from campus (contradicted by other DPS officers' written narratives and Strother's own testimony at Plaintiff's criminal trial, where he conceded that he does not have the authority to ban any student from campus) (*id.* ¶¶ 70, 71); and (5) that he was holding a police radio before the altercation (contradicted by video evidence) (*id.* ¶ 74).

### D.    CRIMINAL ACTION AGAINST PLAINTIFF

Plaintiff was charged with three criminal offenses: (1) fourth degree aggravated assault on a police officer in violation of N.J.S.A. 2C:12-1(b)(5)(A); (2) fourth degree obstructing the administration of the law in violation of N.J.S.A. 2C:29-1(a); (3) third degree resisting arrest with use of physical force in violation of N.J.S.A. 2C:29-2(a)(3); and defiant trespass in violation of N.J.S.A. 2C:18-3(b). (*Id.* ¶ 47.)

The Mercer County Prosecutor's Office dismissed the obstruction and resisting arrest charges and reduced the aggravated assault charge down to simple assault in June and July 2024. (*Id.* ¶ 78.)

In February 2025, at the end of a two-day bench trial in Princeton Municipal Court ("Municipal Court"), the prosecution dismissed the defiant trespass charge. (*Id.* ¶ 78.) Thereafter, on April 1, 2025, Plaintiff was found not guilty of the only remaining charge of simple assault. (*Id.* ¶ 79.)

### E.       THE UNIVERSITY'S INVESTIGATION

Between May and October 2024, University investigators interviewed several witnesses — but not Strother — about the altercation outside Whig Hall. (*Id.* ¶ 58.) On October 9, 2024, the University placed Plaintiff on disciplinary probation for nine months. (*Id.* ¶ 59.)

### F.       PROCEDURAL HISTORY

Plaintiff filed the Complaint on July 30, 2025. (ECF No. 1.) The Complaint asserts the following causes of action against Strother: (1) violation of the First and Fourteenth Amendments as to Plaintiff's right to record on matters of public concern and police activities without retaliation ("Count One"); (2) unlawful arrest and false imprisonment ("Count Two"); (3) excessive force ("Count Three"); and (4) fabrication of evidence ("Count Six"). (*See* Compl. ¶¶ 82–104, 119–125.) Plaintiff asserts the following causes of action against both Strother and Trustees: (1) assault and battery ("Count Four"); (2) malicious prosecution ("Count Five"); (3) intentional infliction of emotional distress ("Count Eight"); and (4) negligent infliction of emotional distress ("Count Nine"). (*See id.* ¶¶ 105–118, 136–148.) And finally, as to Trustees alone, Plaintiff asserts a claim for municipal liability — failure to train and failure to supervise ("Count Seven"). (*See id.* ¶¶ 126–135.)

6

## II.     SUBJECT MATTER JURISDICTION

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 based on Plaintiff's federal claims.  This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's claims arising under state law.

## III.     LEGAL STANDARD

Rule 8(a)(2) "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (abrogated on other grounds)).

A district court conducts a three-part analysis when considering a motion to dismiss pursuant to Rule 12(b)(6).  *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011).  "First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'"  *Id.* (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)).  Second, the court must accept as true all of the plaintiff's well-pleaded factual allegations and "construe the complaint in the light most favorable to the plaintiff."  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citation omitted).  The court, however, may ignore legal conclusions or factually unsupported accusations that merely state the defendant unlawfully harmed plaintiff.  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).  Finally, the court must determine whether "the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'"  *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679).  A facially plausible claim "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 210 (quoting *Iqbal*, 556 U.S. at 663).  On a Rule 12(b)(6) motion, the "defendant bears the burden of showing that no claim has been presented."  *Hedges v. United States*, 404 F.3d

7

744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)).

## IV.    DISCUSSION

Defendants move to dismiss the Complaint pursuant to Rule 12(b)(6).  The Court will address each of Defendants' arguments in turn.

### A.    JUDICIAL NOTICE OF THE MUNICIPAL COURT PROCEEDINGS

Defendants assert that Plaintiff's claims for retaliation, unlawful arrest and false imprisonment, and malicious prosecution must be dismissed because the Municipal Court "unequivocally found probable cause to arrest Plaintiff."  (*See* Moving Br. at 11.)  Defendants claim that the Municipal Court's probable cause finding is entitled to "preclusive effect and bars Plaintiff from relitigating the issue before this Court."  (*Id.*)  In opposition, Plaintiff contends that Defendants improperly "stretch[ ] judicial notice beyond its breaking point."  (Opp'n Br. at 11.)

Generally, "a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings."  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).  An exception to this general rule is that a court may consider "a document integral to or explicitly relied upon in the complaint," without converting the motion to dismiss into a motion for summary judgment.  *Id.* (citation omitted).  Thus, a court should not consider evidence outside the complaint unless (1) the document is incorporated by reference, or (2) the adjudicative fact at issue is subject to judicial notice."  *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)).

Here, Defendants argue that this Court may take judicial notice of transcripts from Plaintiff's Municipal Court trial.  (*See* Moving Br. at 8–9.)  In those transcripts, Defendants assert that the Municipal Court "explicitly found probable cause for Plaintiff's arrest."  (*Id.* at 5, 7.)

8

The Court concludes that the transcripts of the judicial proceedings before the Municipal Court may be considered, but not for their truth. While it is true that a court may take judicial notice of judicial proceedings and opinions, *see Maher v. Baumeister & Samuels, P.C.*, Civ. No. 22-2054, 2022 WL 13008362 (D.N.J. Oct. 21, 2022), a court may not take judicial notice "for the truth of the matter asserted," *Brody v. Hankin*, 145 F. App'x 768, 772 (3d Cir. 1999). The court may only take judicial notice of the existence of the filings and opinions. *See Werner v. Werner*, 267 F.3d 288, 295 (3d Cir. 2001) ("Taking judicial notice of the truth of the contents of a filing from a related action could reach, and perhaps breach, the boundaries of proper judicial notice."). "When a court examines the transcript of a prior proceeding to find facts, it takes it out of the realm of what should be considered under a motion to dismiss." *Muhammad v. Sarkos*, Civ. No. 12-7206, 2014 WL 4418059, at *4 (D.N.J. Sept. 8, 2014) (citing *Lum v. Bank of Am.*, 361 F.3d 217, 222 n.3 (3d Cir. 2004), *abrogated in part on other grounds by Twombly*, 550 U.S. 544). A district court "may take judicial notice of another court's opinion — not for the truth of the facts recited therein, but for the existence of the opinion." *S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.*, 181 F.3d 410, 426 (3d Cir. 1999); *see also Kamal v. J. Crew Grp., Inc.*, 918 F.3d 102, 118–19 (3d Cir. 2019).

Thus, the Municipal Court transcripts would run afoul of the limitations of judicial notice if the Court were to accept the contents of those transcripts as true. However, the Court may — and will — take judicial notice of the Municipal Court transcripts, not for the truth of the matter, but for their existence.

Defendants cite several cases to support their argument that the Court may take judicial notice of the transcripts. (*See* Opp'n Br. at 11–12.) For instance, Defendants cite *Morales v. Maxwell*, Civ. No. 21-7263, 2024 WL 4651757 (D.N.J Nov. 1, 2024) and *Kwanzaa v. Tell*, Civ.

No. 19-16052, 2024 WL 2991194 (D.N.J. June 14, 2024) — opinions delivered at the summary judgment stage, not at the motion to dismiss stage where this matter is currently pending. (*See id.* at 11.) Thus, Defendants' authorities can be easily distinguished from the facts currently before this Court.

In his opposition brief, Plaintiff claims that it would have been more appropriate for Defendants to seek issue preclusion under the collateral estoppel doctrine. (*See* Opp'n Br. at 15.) Although Defendants did not brief the collateral estoppel doctrine in their moving papers, they did briefly engage with the doctrine in their reply. (*See generally* Reply at 2–7.) Regardless, Defendants fail to establish collateral estoppel applies.

The doctrine of collateral estoppel, or issue preclusion, prevents a party from relitigating issues that were adjudicated in a prior lawsuit. *In re Docteroff*, 133 F.3d 210, 214 (3d Cir. 1997). Collateral estoppel exists to promote judicial consistency, encourage reliance on court decisions, and protect defendants from being forced to relitigate the same issues in multiple lawsuits. *Allen v. McCurry*, 449 U.S. 90, 94 (1980). "A federal court looks to the law of the adjudicating state to determine its preclusive effect." *Delaware River Port Auth. v. Fraternal Ord. of Police*, 290 F.3d 567, 573 (3d Cir. 2002) (citation omitted.) In New Jersey, issue preclusion, or collateral estoppel, "bars relitigation of any issue [ ] actually determined in a prior action, generally between the same parties, involving a different claim or cause of action." *State v. Gonzalez*, 380 A.2d 1128, 1131 (N.J. 1977) (internal citations omitted). Under New Jersey law, the party asserting collateral estoppel must show:

> (1) The issue to be precluded is identical to the issue decided in the previous proceeding . . . (2) the issue was actually litigated in the prior action . . . (3) the court in the prior proceeding issued a final judgment on the merits . . . (4) the determination of the issue was essential to prior judgment . . . and (5) the party against whom the

10

> doctrine is asserted was a party to or in privity with a party to the earlier proceeding.

*In re Dawson*, 641 A.2d 1026, 1034–35 (N.J. 1994).

The Court's inquiry does not end with these five elements. Collateral estoppel is an equitable judicial doctrine and as such is "not to be applied if there are sufficient countervailing interests." *Matter of Coruzzi*, 472 A.2d 546, 551 (N.J. 1984). The Court will not preclude a party litigating an issue when it would be "'unfair to do so.'" *Allen v. V & A Bros.*, 26 A.3d 430, 444 (N.J. 2011) (internal citations omitted). While New Jersey's collateral estoppel jurisprudence does not mandate that courts permit equitable considerations to "overcome the ordinary preclusive effects of prior judgments," *Gannon v. Am. Home Prod., Inc.*, 48 A.3d 1094, 1107 (N.J. 2012), courts can rely on fairness considerations to inform the collateral estoppel analysis. *See Olivieri v. Y.M.F. Carpet, Inc.*, 897 A.2d 1003, 1009–10 (N.J. 2006).

Defendants do not meet several of the elements they must show in order for collateral estoppel to apply. As to the first element, the issues to be precluded here are hardly identical to the issues decided before the Municipal Court. Several charges in the criminal complaint were dismissed and not before the Municipal Court. (See Opp'n Br. at 15 (citing Compl. ¶¶ 6, 47, 78–79).)

As to the second element, the issue of probable cause was not actually litigated in the Municipal Court. Only after the Municipal Court rendered its not guilty verdict did the prosecutor request a determination on whether probable cause existed. (ECF No. 17-2, Ex. C at 20:17-20.) Plaintiff's counsel was not given an opportunity to be heard on the issue. (*See id.* at 20:21–21:6.) Plaintiff's counsel did not brief or argue the probable cause issue in any way. Such is insufficient to satisfy the second element. *Merritt v. Kelly*, A-754-21, 2023 WL 7220142, at *7 (N.J. Super. Ct. App. Div. Nov. 2, 2023) ("[T]he municipal court made its [probable cause] finding only *after*

dismissing the summons.  Further, the municipal court gave the parties no advance notice of its intent to address probable cause, nor did it identify the issue as disputed.  As such, plaintiff had no opportunity to present evidence or make argument on the matter before the court ruled."); *United States ex rel. Doe v. Heart Sol., PC*, 923 F.3d 308, 316 (3d Cir. 2019) ("[C]ollateral estoppel cannot apply when [party] . . . did not have a full and fair opportunity to litigate that issue.").

As to the fourth element, the determination of the probable cause issue was not essential to Plaintiff's not-guilty verdict.  As Defendants themselves concede, the verdict "is of no consequence" to the Municipal Court's probable cause determination.  (*See* Moving Br. at 12.)  On this element, the Court finds the New Jersey Superior Court, Appellate Division's decision in *Merritt* helpful.  In *Merritt*, the plaintiff sued several police officers and a police department for retaliation, unlawful arrest and malicious prosecution, manufacturing false evidence, and civil conspiracy under the New Jersey Civil Rights Act.  *Merritt*, 2023 WL 7220142, at *1.  The Appellate Division determined that the lower court had erroneously dismissed the complaint because it should not have relied upon the municipal court's finding of probable cause.  *Id.*  The Appellate Division noted that the issue was not actually litigated in municipal court and that the municipal court "did not make any factual findings in support of its [probable cause] determination" and "made its finding only after dismissing the summons."  *Id.* at *7.  The facts in *Merritt* mirror the facts presently before this Court.

Even if Defendants established all five elements necessary for collateral estoppel to apply, issue preclusion is inappropriate where it would be unfair to apply the doctrine.  *See Sinai Ctr. for Rehab & Healthcare, LLC v. New Jersey Dep't of Health*, Civ. No. 24-9465, 2025 WL 2779033, at *9 (D.N.J. Sept. 30, 2025) (citing *Allen*, 26 A.3d at 444)).  Because Plaintiff challenges the veracity of Strother's testimony throughout the Municipal Court proceedings and the University's

investigation, this Court should not blindly rely upon the Municipal Court's statement that probable cause existed without full development of the factual record. The Municipal Court's finding of probable cause is therefore not an impediment to Plaintiff's claims in this suit.

### B.    CONSTITUTIONAL CLAIMS (COUNTS I, II, III, V, VI, AND VII)

The Court will next address the federal and state constitutional claims Plaintiff asserts against Strother and Trustees pursuant to 42 U.S.C. § 1983 and N.J.S.A. 10:6-1 (the "NJCRA"). As to Strother, Plaintiff alleges: (1) First Amendment retaliation; (2) unlawful arrest and false imprisonment; (3) excessive force; (4) malicious prosecution; and (5) fabrication of evidence. As to Trustees, Plaintiff alleges: (1) malicious prosecution; and (2) municipal liability for failure to train and supervise.

In general, 42 U.S.C. § 1983 establishes a cause of action "against any person who, acting under color of state law, deprives another of his or her federal rights." *Wright v. City of Phila.*, 409 F.3d 595, 599 (3d Cir. 2005). To plead a claim under § 1983, a plaintiff must allege "(1) the violation of a right secured by the Constitution or laws of the United States and (2) that the alleged deprivation was committed or caused by a person acting under color of state law." *Roberson v. Borough of Glassboro*, 570 F. Supp. 3d 221, 226 (D.N.J. 2021) (quoting *Lopez-Siguenza v. Roddy*, No. 13-2005, 2014 WL 1298300, at *4 (D.N.J. Mar. 31, 2014)).

Similarly, "'New Jersey courts . . . analyze a plaintiff's [NJCRA] claims through the lens of Section 1983.'" *Williams v. Bosley*, Civ. No. 18-13092, 2023 WL 3727480, at *8 (D.N.J. May 30, 2023) (quoting *Alfaro v. Rempusheski*, Civ. No. 21-2271, 2021 WL 5995758, *2 (D.N.J. Dec. 10, 2021)). The New Jersey State Legislature intended the NJCRA to act "'as an analogue to [Section 1983] and sought to incorporate existing [Section] 1983 jurisprudence.'" *Id.* (quoting *Baldeo v. City of Paterson*, Civ. No. 18-5359, 2019 WL 277600, at *10 (D.N.J. Jan. 18, 2019)).

Thus, "[c]ourts have repeatedly construed the [NJCRA] in terms nearly identical to its federal counterpart: Section 1983." *Chapman v. New Jersey*, Civ. No. 08-4130, 2009 WL 2634888, *3 (D.N.J. Aug. 25, 2009) (citation omitted).

Relevant to this case, the University, while private, is nevertheless subject to liability under Section 1983 with respect to its policing. *See Henderson v. Fisher*, 631 F.2d 1115, 1118 (3d Cir. 1980) (campus police qualified as state actors); *Warman v. Mount St. Joseph Univ.*, 144 F.4th 880, 893 (6th Cir. 2025) ("[O]fficers of a private university's campus police department . . . acted under color of state law and are therefore subject to § 1983 liability.").

### 1.    Count One: First Amendment Retaliation

To assert a plausible First Amendment retaliation claim, a plaintiff must allege that: "(1) [he engaged in] constitutionally protected conduct, (2) [there was] retaliatory action sufficient to deter a person of ordinary firmness from exercising [his] constitutional rights, and (3) [there was] a causal link between the constitutionally protected conduct and the retaliatory action." *Conard v. Pennsylvania State Police*, 902 F.3d 178, 183 (3d Cir. 2018). "The first factor is a question of law; the second factor is a question of fact." *Hill v. Borough of Kutztown*, 455 F.3d 225, 241 (3d Cir. 2006).

Defendants argue that Plaintiff's First Amendment retaliation claim should be dismissed because the Municipal Court's finding of probable cause is a complete defense to Plaintiff's claim for retaliation. (Moving Br. at 11–13.) As discussed, this Court will take judicial notice of the existence of the Municipal Court's transcripts, not for the truth of the matter therein. Defendants offer no alternative argument as to why the First Amendment retaliation claim should be dismissed. On a review of the Complaint, the Court finds that all necessary elements have been plausibly alleged. Plaintiff alleges that: (1) he was engaging in constitutionally protected conduct (recording police actions in furtherance of the public's right of access to information regarding a matter of

14

public concern); (2) he suffered retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights (Strother physically dropped Plaintiff down the stairs of Whig Hall to prevent Plaintiff from recording and arresting Plaintiff); and (3) the retaliation was connected to the constitutionally protected conduct. (*See* Compl. ¶¶ 82–91.) As such, Count One will not be dismissed.

### 2.    Count Two: Unlawful Arrest & False Imprisonment

To plead a false arrest claim, a plaintiff must plausibly allege that he was arrested without probable cause. *Voorhis v. Ginkel*, App. No. 24-2859, 2025 WL 2556241, at *2 (3d Cir. Sept. 5, 2025) (citing *Lozano v. New Jersey*, 9 F.4th 239, 245 (3d Cir. 2021)). To plead a false imprisonment claim, a plaintiff must plausibly allege that he was detained pursuant to an arrest that was made without probable cause. *Id.* (citing *Lozano*, 9 F.4th at 246). "[W]here the police lack probable cause to make an arrest, the arrestee has a claim under § 1983 for false imprisonment based on a detention pursuant to that arrest." *Groman v. Twp. of Manalapan*, 47 F.3d 628, 636 (3d Cir. 1995). Conversely, "[f]alse arrest and false imprisonment claims will 'necessarily fail if probable cause existed for any one of the crimes charged against the arrestee.'" *Harvard v. Cesnalis*, 973 F.3d 190, 199 (3d Cir. 2020) (quoting *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 477 (3d Cir. 2016)).

Although "[f]alse arrest and false imprisonment overlap" and "the former is a species of the latter," *Wallace v. Kato*, 549 U.S. 384, 388 (2007), the two are "still distinct claims." *Jones v. Somerset Cnty. Prosecutor's Off.*, Civ. No. 15-2629, 2015 WL 5248573, at *4 (D.N.J. Sept. 9, 2015). While "[t]he basis for false arrest is the arrest itself," the basis for false imprisonment "is the detention that follows the false arrest." *Id.* (quoting *Reedy v. Twp. of Cranberry*, Civ. No. 06-1080, 2007 WL 23418084, at *3 (W.D. Pa. Aug. 9, 2007)).

15

Again, Defendants argue that Plaintiff's unlawful arrest and false imprisonment claim should be dismissed because the Municipal Court's finding of probable cause is a complete defense to Plaintiff's claim for retaliation. Nonetheless, Defendants once more offer no other argument supporting dismissal of this claim. (Moving Br. at 11–13.) As discussed, this Court will take judicial notice of the existence of the Municipal Court's transcripts, not for the truth of the matter therein. Plaintiff plausibly alleges that he was arrested without probable cause. He specifically alleges that he was unlawfully seized when Strother "stopped his freedom of movement, grabbed him, picked him up, dropped him down the stairs of Whig Hall, held him face-down on the ground by his wrist, and ordered him handcuffed without probable cause." (Compl. ¶ 94.) Plaintiff also alleges that he was detained at DPS headquarters and remained detained while he sought medical treatment for his injuries. (*Id.* ¶ 95.) Such allegations are sufficient to state a claim for false arrest and imprisonment.

### 3.    Count Three: Excessive Force

"To state a claim for excessive force as an unreasonable seizure under the Fourth Amendment, a plaintiff must show that a 'seizure' occurred and that it was unreasonable." *Noble v. City of Camden*, 112 F.Supp.3d 208, 227 (D.N.J. 2015) (citation modified). "The use of excessive force is itself an unlawful 'seizure' under the Fourth Amendment." *Id.* (citation modified). Reasonableness is an objective standard based on the totality of the circumstances, whereby a court must conduct an examination into the "facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (citation modified).

Defendants argue that Plaintiff only pleads general allegations of excessive force and that comments made by the Municipal Court establish that Strother acted reasonably under the

circumstances.   (*See* Moving Br. at 14–15.)   Plaintiff maintains that he adequately pled his excessive force claim.

Plaintiff pleads that his arrest constituted an unreasonable seizure because Strother "deliberately used excessive force under the circumstances when he aggressively grabbed [Plaintiff's] arm, violently pulled him, picked him up, dropped him down the stairs, held him face-down on the ground by his wrist, and ordered him handcuffed . . . without justification while [Plaintiff] was acting lawfully, had committed no crime, and did not pose any threat." (Compl. ¶ 100.) Plaintiff also alleges that he suffered physical injuries and emotional distress as a result of the altercation. (*Id.* ¶ 103.) Reading these allegations in the light most favorable to Plaintiff, the facts pled are sufficient to articulate a claim that Strother used excessive force to effectuate Plaintiff's arrest. *See Walker v. City of Newark*, Civ. No. 19-16853, 2020 WL 3542502, at *8 (D.N.J. June 30, 2020). Plaintiff therefore sufficiently pleads an excessive force claim against Strother.

### 4.   Count Five: Malicious Prosecution

To state a claim for malicious prosecution under § 1983 a plaintiff must show "(1) the defendant initiated a criminal proceeding; (2) the criminal proceeding ended in [the plaintiff's] favor; (3) the defendant initiated the proceeding without probable cause; (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding." *Waselik v. Township of Sparta*, Civ. No. 16-4969, 2017 WL 2213148, at *8 (D.N.J. May 18, 2017) (quoting *Halsey*, 750 F.3d at 296–97).

"The essence of an action for malicious prosecution is that the proceeding was instituted without probable cause, that the complainant was actuated by a malicious motive in making the charge." *Earl v. Winne*, 101 A.2d 535, 543 (N.J. 1953) (citation omitted). Probable cause is

defined as "reasonable grounds for suspicion supported by circumstances sufficiently strong in themselves to warrant an ordinarily cautious [person] in the belief that the accused is guilty of the [offense] with which he is charged." *Lind v. Schmid*, 337 A.2d 365, 369 (N.J. 1975).  In a suit for malicious prosecution, courts conduct an objective inquiry as to whether probable cause can be inferred from the facts known to the defendant at the time criminal charges were initiated. *Stolinski v. Pennypacker*, 772 F. Supp. 2d 626, 642–43 (D.N.J. 2011); *Lind*, 337 A.2d at, 369 ("The plaintiff must demonstrate that at the time when the defendant put the proceedings in motion the circumstances were such as not to warrant an ordinarily prudent individual in believing that an offense had been committed.").  Plaintiff bears the burden of establishing a lack of probable cause. *Lind*, 337 A.2d at 368.  Malice may be inferred from a lack of probable cause.  *Id.*

Again, Defendants argue that Plaintiff's unlawful arrest and false imprisonment claim should be dismissed because the Municipal Court's finding of probable cause is a complete defense to Plaintiff's claim for retaliation and – yet repeatedly – Defendants offer no other argument supporting dismissal.  (Moving Br. at 11–13.)  As discussed, this Court will take judicial notice of the existence of the Municipal Court's transcripts, not for the truth of the matter therein.

Plaintiff alleges that Strother and Trustees initiated criminal proceedings against him. (Compl. ¶ 110.)  He also alleges that the Municipal Court proceeding ended in his favor when the prosecution dropped three out of the four charges by close of trial and when he was acquitted of the only remaining charge after trial. (*Id.* ¶ 112.)  Plaintiff asserts that Defendants lacked probable cause to initiate, maintain, and pursue the charges asserted against him in Municipal Court. (*Id.* ¶ 113.)  Additionally. Plaintiff alleges several discrepancies between Strother's testimony in Municipal Court and video evidence of the altercation. (*Id.* ¶ 113.)  For example, Plaintiff alleges that Strother did not inform Plaintiff that Whig Hall was closed, that Strother himself initiated

18

physical contact, and that he was not wearing a police radio or other clothing identifying him as an officer. (*Id.*) Plaintiff alleges that Defendants maliciously maintained the proceedings against Plaintiff to cover up Strother's actions. (*Id.* ¶ 114.) Finally, Plaintiff asserts that he suffered deprivation of liberty, including physical and economic injuries and severe emotional distress. (*Id.* ¶ 17.) Therefore, Plaintiff sufficiently pleads his malicious prosecution claim against both Strother and the Trustees.

### 5.    Count Six: Fabrication of Evidence

The Third Circuit has held that there can be "a stand-alone Fourteenth Amendment claim predicated on the fabrication of evidence." *Halsey v. Pfeiffer*, 750 F.3d 273, 294 (3d Cir. 2014); *Ebuzor-Onayemi v. Union Cty. Police Dep't.*, Civ. No. 16-1869, 2017 WL 1377640, at *3 (D.N.J. Apr. 12, 2017) ("In the Third Circuit, fabrication-of-evidence is a freestanding constitutional tort."). An acquitted defendant can bring a claim for fabrication of evidence if "there is a reasonable likelihood that, absent that fabricated evidence, the defendant would not have been criminally charged." *Black v. Montgomery Cnty.*, 835 F.3d at 371.

A plaintiff must demonstrate a "meaningful connection" between the injury and the use of the fabricated evidence. *Id.* (quoting *Halsey*, 750 F.3d at 294 n.19). There is also a requirement that the evidence be "so significant that it could have affected the outcome of the criminal case." *Id.* (quoting *Halsey*, 750 F.3d at 295). And, the standard required to demonstrate that evidence is fabricated is a "notable bar." *Id.* For example, "testimony that is . . . simply disputed should not be treated as fabricated . . . ." *Id.* at 372.

Here, Plaintiff must allege that the "proponents of the evidence [were] aware that evidence [wa]s incorrect or . . . offered in bad faith." *Boseman v. Upper Providence Twp.*, 680 Fed. App'x 65, 70 (3d Cir. 2017) (citation omitted). Plaintiff does so. (Compl. ¶¶ 63–79, 119–25.) Plaintiff alleges specific instances of intentional, material fabrications in official police reports and in

19

testimony pertaining to his arrest and prosecution.  (*Id.* ¶¶ 63–79, 120–22.)  As such, Plaintiff sufficiently pleads his claim of fabrication of evidence against Strother.

### C.    TORT CLAIMS

The Court will next address the tort claims Plaintiff asserts against Strother and the Trustees.  Plaintiff alleges: (1) assault and battery; (2) intentional infliction of emotional distress ("IIED"); and (3) negligent infliction of emotional distress ("NIED").

#### 1.    Count Four: Assault & Battery

Count Four alleges assault and battery.  Plaintiff alleges that Strother and by extension Trustees, assaulted and battered him and that as a direct and proximate result, Plaintiff suffered severe and permanent injuries.  (Compl.  ¶¶ 105–08.)

Both assault and battery are intentional torts.  *Corradetti v. Sanitary Landfill, Inc.*, 912 F. Supp. 2d 156, 161 (D.N.J. 2012).  "Common-law battery is an intentional tort involving the harmful or offensive touching of plaintiff's person without his consent."  *Caldwell v. KFC Corp.*, 958 F. Supp. 962, 970 (D.N.J. 1997).  Common law assault occurs when a defendant "intends only to cause apprehension" that battery is imminent.  *Kelly v. County of Monmouth*, 380 N.J. Super. 552, 559 (App. Div. 2005).

First, Defendants argue that the Municipal Court's probable cause finding defeats this claim.  (Moving Br. at 23.)  However, even if an arrest was lawful, an officer's otherwise lawful battery is "negated by the use of excessive force."  *Groman v. Twp. of Manalapan*, 47 F.3d 628, 634 (3d Cir. 1995).  Plaintiff's pleadings include allegations of excessive force.  (*See* Compl. ¶¶ 2, 4, 39–42, 100–02, 106.)

Next, Defendants argue that Plaintiff's claim against the University fails because the Complaint does not allege that the University intended to or did cause the harmful or offensive contact.  (Moving Br. at 23.)  Although Plaintiff asserts this claim against the University, these

allegations as they currently read do not plead a plausible tort claim.  *See Doss v. Osty*, Civ. No. 10-3497, 2011 WL 2559558, at *7 (D.N.J. June 27, 2011) (holding that plaintiff failed to state a claim against municipal defendants when only one individual was alleged to have committed the "harmful or offensive contact.").  Plaintiff only alleges intent regarding the assault and battery as to Strother.  *See id.*  Strother is the only one alleged to have committed a "harmful or offensive contact."  *See id.*  As such, Plaintiff fails to state a common law assault and battery as to Trustees and this count against Trustees will be dismissed without prejudice.  Plaintiff's claim as to Strother will be permitted to proceed.

### 2.    Count Eight: Intentional Infliction of Emotional Distress

Count Eight of the Complaint alleges IIED.  Specifically, Plaintiff alleges that Strother "acted in an extreme and outrageous manner when he conducted a vicious, unprovoked, and humiliating attack against [Plaintiff] by intentionally grabbing him, picking him up 'like an open pair of scissors,' and dropping him down the front steps of Whig Hall."  (Compl. ¶ 137.)  Plaintiff also alleges that Strother's false statements about the altercation resulted in criminal charges against Plaintiff and adverse action being taken against Plaintiff on campus.  (*Id.* ¶¶ 137–38.)

"Intentional infliction of emotional distress consists of 'extreme and outrageous conduct [which] intentionally or recklessly causes severe emotional distress to another.'"  *Lingar v. Live-In Companions, Inc.*, 300 N.J. Super. 22, 34 (App. Div. 1997) (citing *Buckley v. Trenton Sav. Fund Soc'y*, 111 N.J. 355, 366 (1988)) (quoting Restatement (Second) of Torts § 46 (1965)).  A plaintiff must allege the following elements to state a claim for intentional infliction of emotional distress: (1) conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious[] and utterly intolerable in a civilized community," (2) a deliberate act, committed with the intent to cause emotional distress or with deliberate disregard of a high probability that emotional distress would occur, (3) proximately

causing emotional distress that is "so severe that no reasonable man could be expected to endure it." *Buckley*, 111 N.J. at 366 (quoting Restatement (Second) of Torts § 46, comments d and j (1965)); *see also Green v. City of Paterson*, 971 F. Supp. 891, 911 (D.N.J. 1997).  For conduct to be "extreme and outrageous," New Jersey courts require that the conduct have been "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Ingraham v. Ortho-McNeil Pharm.*, 422 N.J. Super. 12, 21 (App. Div. 2011).  Courts refer to it as an "elevated threshold" which is "satisfied only in extreme cases." *Id.* (quoting *Griffin v. Tops Appliance City, Inc.*, 337 N.J. Super. 15, 23 (App. Div. 2001)).  It is the responsibility of the court to determine as a matter of law whether the required level of distress could reasonably be found.  *See Buckley*, 111 N.J. at 367; *Fleming v. United Parcel Serv., Inc.*, 255 N.J. Super. 108, 167 (Law Div. 1992).

Here, Plaintiff has alleged conduct on the part of Defendants that would support a cause of action for IIED.  Putting aside that IIED claims are "rarely dismissed on a motion to dismiss," *Yujie Wang v. N.J. State Police*, Civ. No. 18-11933, 2019 WL 3887126, at *6 ((D.N.J. Aug. 19, 2019) (internal quotations omitted) (citing *Acevedo v. Monsignor Donovan High Sch.*, 420 F. Supp. 2d 337, 349 (D.N.J. 2006)), Plaintiff has sufficiently pled intent to cause the emotional distress and that Defendants' conduct was extreme and outrageous.  As to intent, Plaintiff alleges Strother lacked probable cause to arrest him, that Strother used excessive force in a physical altercation that caused serious bodily and emotional injury, and that the University compounded Plaintiff's injury with "cruel post-arrest actions."  (*See* Opp'n Br. at 33.)  Plaintiff asserts that Strother knowingly provided false information to initiate and pursue criminal charges and to lay the groundwork for the University's ban of Plaintiff from campus and removal from his on-campus residence.  (*See* Compl. ¶¶ 1, 5, 6, 50–57, 63–79. 137–38.)  Plaintiff also alleges that Strother's

22

efforts prompted the University's investigation, which "ignored witness, video, and photographic evidence[] in an effort to intimidate" Plaintiff. (*Id.* ¶¶ 5–6, 50–79, 137–41.) Plaintiff alleges that he suffered damages, including physical, economic, and emotional injuries and struggles to sleep and function on a day-to-day basis. (*Id.* ¶ 142.) Furthermore, the Court takes into account the distinct power imbalance between Strother — a law enforcement veteran and administrator at the University — and Plaintiff — a University student. *See Taylor v. Metzger*, 706 A.2d 685, 695–96 (N.J. 1998) (holding abusive conduct perpetrated by a defendant with "authority and power" over plaintiff supports IIED claim). Accordingly, the portion of Defendants' Motion seeking to dismiss Plaintiff's IIED claim will be denied.

### 3.    Count Nine: Negligent Infliction of Emotional Distress

Under New Jersey law, there are two legal theories under which a plaintiff can establish a prima facie claim for NIED. First, a plaintiff can show: (1) "death or serious physical injury of another caused by defendant's negligence; (2) a marital or intimate family relationship between plaintiff and the injured person; (3) observation of the death or injury at the scene of the accident; and (4) resulting severe emotional distress." *Fleming v. United Parcel Serv., Inc.*, 604 A.2d 657, 686 (N.J. Super. Ct. Law. Div. 1992). Second, a plaintiff can show "the defendant's negligent conduct placed the plaintiff in 'reasonable fear of immediate personal injury,' which gave rise to emotional distress that resulted in a substantial bodily injury or sickness." *Jablonowska v. Suther*, 948 A.2d 610, 618 (N.J. 2008).

Defendants argue that Plaintiff's NIED claim falls under New Jersey's Charitable Immunity Act ("NJCIA"). (*See* Opp'n Br. at 26–29.) The NJCIA bars negligence claims against nonprofits "organized exclusively for religious, charitable, or educational purposes," as well as their "employees, agents, servants or volunteers." N.J. Stat. Ann. § 2A:53-7(a). The NJCIA applies to the University. *See O'Connell v. State*, 171 N.J. 484, 795 A.2d 857, 866 (2002)

23

("[C]olleges plainly meet the statutory definition of a charitable institution under the [NJCIA] — a 'nonprofit corporation . . . organized exclusively for . . . educational purposes.") (quoting N.J. Stat. Ann. § 2A:53A-7a).

To establish immunity under the NJCIA, an entity must show "(1) [it] was formed for nonprofit purposes; (2) [it] is organized exclusively for religious, charitable or educational purposes; and (3) [it] was promoting such objectives and purposes at the time of the injury to plaintiff who was then a beneficiary of the charitable works." *Green v. Monmouth University*, 237 N.J. 516, 206 A.3d 394, 403 (2019). As to the first two prongs, courts in the Third Circuit and the State of New Jersey have consistently recognized the University as a nonprofit institution organized exclusively for educational purposes. *See, e.g., Doe v. Princeton Univ.*, 790 Fed. App'x 379 (3d Cir. 2019); *Doe v. Princeton Univ.*, Civ. No. 19-7853, 2020 WL 7383192 (D.N.J. Dec. 16, 2020); *Lax v. Princeton Univ.*, 779 A.3d 449, 452 (Super Ct. App. Div. 2001).

As to the third prong, the Court must determine whether the University was promoting its educational purposes at the time of Plaintiff's arrest and whether Plaintiff was a beneficiary of such promotion. The "beneficiary" prong involves "two inquiries." *Green*, 206 A.3d at 403. The first is whether "the organization pleading the immunity, at the time in question, 'was engaged in the performance of the . . . objectives it was organized to advance.'" *Id.* (quoting *Ryan v. Holy Trinity Evangelical Lutheran Church*, 175 N.J. 333, 350, 815 A.2d 419 (N.J. 2003)). The second inquiry is whether "the injured party [was] a direct recipient of those good works," *i.e.,* a "beneficiary." *Id.* (quoting *Ryan*, 175 N.J. at 350, 815 A.2d 419). The phrase "educational purpose" has been interpreted broadly. *Id.* at 538. Accordingly, nonprofit entities have "substantial latitude in determining the appropriate avenues for achieving their objectives." *Orzech v. Fairleigh Dickinson Univ.*, 411 N.J. Super. 198, 206 (App. Div. 2009) (quoting *Bloom*

24

*v. Seton Hall Univ.*, 307 N.J. Super. 487, 491 (App. Div. 1998)).  For example, in *Green*, the New Jersey Supreme Court held that a non-student injured at a concert on campus could not sue the university for negligence because the concert was "a cultural and educational experience" the attendee received.  237 N.J. at 538.  Additionally, courts have recognized that a university is engaged in educational works where it provides a "campus experience that allows the opportunity for diverse forms of social interchange . . . consistent with reasonable educational goals."  *Spencer v. Princeton Univ.*, Civ. No. 19-20945, 2023 WL 2958387, at *3 (D.N.J. Feb. 28, 2023), *aff'd* Civ. No. 23-1663, 2024 WL 575103 (3d Cir. Feb. 13, 2024) (citing *Orzech*, 411 N.J. Super. at 209; *Bloom*, 307 N.J. Super. at 492).

Plaintiff was a student on the University's campus and his "presence . . . on . . . campus as an enrolled student during the academic term suggests that he was a beneficiary."  *Id.* at *10 (internal quotations omitted).  The University was promoting its educational purposes at the time of Plaintiff's arrest and Plaintiff was a beneficiary of such promotion.

If the NJCIA applies, the Defendants are not liable for ordinary negligence.  "Gross negligence and negligence claims consist of the same elements: duty, breach, causation, and injury."  *Sines v. Darling Ingredients Inc.*, Civ. No. 19121, 2020 WL 5015488, at *5 (D.N.J. Aug. 25, 2020).  "Gross negligence differs from negligence in terms of 'degree rather than . . . quality,' requiring proof of 'wanton or reckless disregard for the safety of others.'"  *Id.* (quoting *In re Paulsboro Derailment Cases*, Civ. No. 12-7468, 2015 WL 5028301, at *8 (D.N.J. Aug. 18, 2015)).  "Gross negligence refers to a person's conduct where an act or failure to act creates an unreasonable risk of harm to another because of the person's failure to exercise slight care or diligence."  *Steinberg v. Sahara Sam's Oasis, LLC*, 226 N.J. 344, 364 (2016) (quoting Model Jury Charges (Civil), 5.12, "Gross Negligence" (2009)).

Here, although Defendants assert that Plaintiff alleges only ordinary negligence, "determinations as to the degree of negligent conduct are necessarily fact questions best left in the providence of a factfinder so long as negligence is appropriately pled." *Melone v. Cryoport Inc.*, Civ. No. 23-3243, 2024 WL 1743108, at *7 (D.N.J. Apr. 23, 2024). And, because "the difference between ordinary negligence and gross negligence is only a matter of degree," *Id.* (citing *Steinberg*, 142 A.3d at 754), this Court will not dismiss Plaintiff's NIED claim at this juncture.

### D.    MUNICIPAL LIABILITY

The Court will now turn to the remaining claim against Trustees. Count Seven alleges negligent training and supervision against Trustees. Namely, Plaintiff alleges that the University's policies were inadequate to train its officers and employees to carry out their duties at protests and other events in which students may be participating in, observing, or recording. (*See* Compl. ¶¶ 129–131.) As a direct and proximate result of the University's negligent training and/or supervision, Plaintiff suffered damages. (*Id.* at 135.) Defendants allege that Plaintiff's municipal liability claim suffers from fatal deficits that require dismissal. (Moving Br. at 17–23.)

"The torts of negligent training and supervision require the plaintiff to show the four elements of negligence." *Gardner v. N.J. State Police*, Civ. No. 15-8982, 2016 WL 6138240, at *4 (D.N.J. Oct. 21, 2016) (citing *Dixon v. CEC Entm't, Inc.*, Civ. No. 10-06T1, 2008 WL 2986422, at *19 (N.J. Super. Ct. App. Div. Aug. 6, 2008)). Namely, to prevail on a negligent training claim, a plaintiff must demonstrate that "(1) the defendant owed a duty of care to the plaintiff to properly train its employees, (2) defendant breached that duty of care, (3) defendant's breach was the proximate cause of plaintiff's injury, and (4) defendant's breach caused actual damages to plaintiff." *Panarello v. City of Vineland*, 160 F. Supp. 3d 734, 768 (D.N.J. 2016) (quoting *Brijall v. Harrah's Atl. City*, 905 F. Supp. 2d 617, 621 (D.N.J. 2012)).

26

Section 1983 claims against a municipality may proceed in two ways: (1) "plaintiff may put forth that an unconstitutional policy or custom of the municipality led to his or her injuries," or (2) "that they were caused by a failure or inadequacy by the municipality that 'reflects a deliberate or conscious choice.'" *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019) (quotation omitted).

A litigant seeking to impose liability on a municipality under Section 1983 must plead sufficient facts to demonstrate that such a custom or policy caused the constitutional violation at issue in order to obtain a judgment against a municipality. *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 820 (1985); *see also Natale v. Camden County Correctional Facility*, 318 F.3d 575, 584 (3d Cir. 2003). To sustain a Section 1983 claim against a municipality, at the very least, there must be an affirmative link between the policy [or custom] and the particular violation alleged." *Tuttle*, 471 U.S. at 823. Further, it is insufficient for a plaintiff's allegations to be "wholly conclusory without one tidbit of factual support." *Kilagriff v. Strunk*, Civ. No. 18-10120, 2019 WL 1434763, at *5 (D.N.J. Mar. 31, 2019). Rather, a plaintiff must "back[] up his claims with facts, which, when accepted as true, [provide] support as to the plausibility of his *Monell* claims." *Id.*

As explained, a plaintiff can establish *Monell* liability either by alleging: (1) a "policy or custom" led to the constitutional injury, or (2) that the constitutional injuries were caused by a failure or inadequacy by the municipality that reflects a deliberate or conscious choice. *See Martinez v. City of Asbury Park*, 2021 WL 1343837, at *5 (D.N.J. Mar. 5, 2021) (quoting *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019)). Here, Plaintiff alleges the second avenue. A single incident can prompt failure-to-train liability where the injury is "a highly predictable consequence" of inadequate training. *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 223–25 (3d Cir. 2014).

27

It is plausible that constitutional deprivations are "a highly probable consequence" of officers' inability to appropriately handle student protests on campus. *See id.* at 223–25. Plaintiff alleges such: "[i]t is obvious that officers would need to know how to address students observing and reporting on . . . protests" and "[i]t is predictable that without the necessary tools to handle these situations . . . [o]fficers will likely continue to violate students' constitutional rights." (Compl ¶ 134.)

Plaintiff also adequately pleads deliberate indifference. Deliberate indifference requires that "(1) municipal policymakers know that employees will confront a particular situation, (2) the situation involves a difficult choice or a history of employees mishandling, and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights. *Forrest*, 930 F.3d at 106. Plaintiff "need not provide details about [the University's] specific training programs or protocols at this stage of the case." *Martinez*, 2021 WL 1343837, at *7.

Plaintiff meets all three elements of the deliberate indifference test. First, Plaintiff pleads specific facts alleging that the University knew or should have known its officers would "confront a particular situation." *See Martinez*, 2021 WL 1343837, at *5. Generally speaking, student protests on a university campus are not unusual. Here there was more specific notice. Plaintiff himself warned the University that an on-campus demonstration was planned for the date at issue. (Compl. ¶¶ 23–26.) The University appears to have known about the demonstration, as it issued a warning to students. (*Id.* ¶ 24.) Second, Plaintiff sufficiently alleges that interaction with student protestors may involve a difficult choice for officers. *See Forrest*, 930 F.3d at 106. Plaintiff alleges that the University prompted their officers to oversee protests and demonstrations where officers would have to balance their public safety duties as well as students' First Amendment rights. (Compl. ¶¶ 30, 36–37, 83–91, 129–34.) Finally, Plaintiff adequately alleges that the "wrong

28

choice" could "frequently cause deprivation[s] of constitutional rights." *Carter*, 181 F.3d at 357. (Compl. ¶¶ 133–34.)  "[T]he First Amendment . . . [encompasses a right to record — photograph, film, or audio record — police officers conducting official police activity in public areas." *Fields v. City of Philadelphia*, 862 F.3d 353, 360 (3d Cir. 2017).  Of course, it follows that physical altercations may deprive protestors of their First Amendment rights.  Accordingly. Plaintiff adequately states a *Monell* claim against the University.

V.    **CONCLUSION**

For the reasons stated above, the Court will **GRANT IN PART** and **DENY IN PART** Defendants' Motion to Dismiss.  Count Four as asserted against Trustees will be **DISMISSED WITHOUT PREJUDICE**.  The Court will grant Plaintiff leave to file a First Amendment Complaint within 14 days limited to remedying the defects identified in this Opinion.  An appropriate Order will follow.

Date: July 31, 2026

s/ Zahid N. Quraishi
**ZAHID N. QURAISHI**
**UNITED STATES DISTRICT JUDGE**

29